Argued March 6, affirmed April 4, petition for rehearing denied
April 25, 1951

SCHWEIGER ET UX. *v.* SOLBECK ET UX.
HONIG ET UX. *v.* SOLBECK ET UX.
230 P. 2d 195

*Wallace A. Johansen* argued the cause for appellants. With him on the brief were McKeown & Newhouse, all of Coos Bay.

*Wesley A. Franklin* argued the cause for respondents. On the brief were Lord, Anderson & Franklin, of Portland.

Before BRAND, Chief Justice, and HAY, ROSSMAN, WARNER and TOOZE, Justices.

HAY, J.

These are two separate actions based upon the same facts. The plaintiffs in each case owned real property fronting on Ten Mile Lake, in Coos County. The properties are adjacent. They measure 50 feet on the side fronting the lake and approximately 380 feet in depth. Upon each property, prior to the event hereinafter mentioned, there stood a furnished cabin. Beginning about 100 yards from the back line of the prop-

erty, a steep ravine or draw extends. The lower part of the draw ascends on a fairly easy grade, but the rest is much steeper. The rate of ascent or gradient varies between about 30 and 70 per cent. In June or July, 1947, the defendants began logging a tract of second growth timber in the ravine and on surrounding land. The logging operation, as far as the timber in the ravine was concerned, was completed in September, 1947. A considerable amount of debris, technically called slashing, and consisting of limbs, broken tops, and small trees and brush uprooted in the operation, remained along the sides and bottom of the ravine. In the late fall, after the rainy season set in, an unsuccessful attempt was made by the loggers to burn such slashing.

During December, 1947, and the early part of January, 1948, there was a period of heavy rainfall. On January 6, 1948, a mass of this logging debris was carried from the ravine onto and over plaintiffs' property, either by a flood of water, or by a landslide, or by a combination of both, demolishing plaintiffs' cabins and covering their land with mud, silt and debris. Plaintiffs thereupon instituted these actions.

The complaints are identical in form. They charge the defendants with negligence and carelessness in the conduct of their said logging operation, "in that they failed to clean up the fallen logs and brush and general debris left" thereby, and allowed the same to collect in such manner "that it diverted the natural flow of the water from said land into Ten Mile Lake and caused the water to back up on said land in large pools." They recite that, as a direct and proximate result of such negligence and carelessness, fallen timber, logs and brush were carried onto and across plaintiffs' property,

destroyed their cabins, and carried onto such property mud, silt, logs, brush and general debris. Each complaint demanded general damages of $3,000, and special damages of $500 for the expense of clearing the debris from the property.

The defendants answered by general denial in each case, admitting, however, that they conducted the logging operation, and that some slashing therefrom and some soil were carried to plaintiffs' property. Affirmatively, their answers alleged that they conducted their logging operation with skill, with due care toward the property of others, and in compliance with the statutes of Oregon regulating such operations; that the movement of slashing and soil from defendants' premises was caused by circumstances over which they had no control, and which, in the exercise of due care, they could not prevent, namely, acts of God; more specifically, that, immediately prior to the happening of such movement, excessive rains fell in that area and upon the locus in quo; that such excessive rains caused the earth to become saturated, resulting in numerous landslides, including landslides affecting defendants' and plaintiffs' properties; that the premises logged by defendants consisted of steep, sloping ground; that the landslide affecting defendants' and plaintiffs' properties began at the base of a slope on plaintiffs' premises; that such landslide removed the natural support from defendants' premises on adjacent and higher ground, resulting in the slipping of the soil and slashings thereon to the lower and adjacent ground at the base of the slope; that such movement of soil and slashings, and the movement of earth and logs on plaintiffs' premises, were caused by the excessive rains, saturation of earth and resulting landslide; and that such rains and land-

slides were acts of God, and were the sole, direct and proximate cause of the plaintiffs' damages, if any.

Appropriate replies were filed by the respective plaintiffs, and the causes, being at issue, were consolidated for trial. Trial resulted in a verdict for plaintiffs for $1,500 in each case. Judgments were entered accordingly, and defendants have appealed.

The defendants assign error upon the refusal of the trial court to allow their motions for nonsuit and for directed verdict. They contend not only that plaintiffs failed to prove a cause sufficient to be submitted to the jury, § 6-201, O.C.L.A., as amended by ch. 313, Oregon Laws 1941, but also that they adduced literally no sustaining evidence whatever. *Camirand v. De Lude,* 124 Or 189, 192, 264 P 355.

■ We have reviewed the evidence in the light most favorable to the plaintiff, as the rule requires. *Funkhauser v. Goodrich,* 187 Or. 220, 223, 210 P. 2d 487. We find that there was substantial evidence to the following effect: After the logging was completed, the ravine was full of debris, logs and limbs. The sides of the ravine were so steep that a considerable quantity of debris had slid down to the bottom. Evidence on the part of defendants indicated that the logging operation was carried on in the usual, customary manner, and that when it was completed the ground "looked on an average like any of the rest of the country that is logged." But there was no evidence that the steepness of the ravine, the close proximity of plaintiffs' premises thereto, and the fact that there was a watercourse along its bottom which carried water in the rainy season, caused defendants to take any special care in their logging to protect plaintiffs' property. As to the steep-

ness of the ravine, defendants' logger, Mr. Anderson testified:

"A. I will say that it was just steep enough that it took a well experienced logger to get up and down like a man should. A greenhorn could never have done it, it was plenty steep, in fact a lot of them [sic] stood on their ends."

He said that when they logged on the steep slopes above, tree tops, slashings, and discarded limbs and poles slid down into the ravine. Photographs in evidence show large piles of logging debris lying upon plaintiffs' property. The defendant, H. V. Solbeck, testified that a lot of trees smaller than 18 inches [at the butt] were knocked down in the logging operation, and that the logs showing in the photographs were "probably small stuff that fell as we yarded in there."

There were no eye-witnesses to the catastrophe, but there were upon the premises physical indications from which it might have been inferred that a considerable flood of water had come down the ravine. Such evidence consisted of water marks and other indications of a flood of water with a crest of from 12 to 15 feet high, which water marks, etc., were not present before the event complained of. One of defendants' witnesses, Mr. D. L. Buckingham, a civil engineer, who visited the premises a few days after the event, admitted that he had stated to plaintiffs on that occasion that it would require probably a 30-foot wall of water to wash out those cabins "that way." He said, but plaintiffs denied, that he added that he couldn't see where that water could come from; where it could accumulate.

There was evidence that the recent rainfall had been heavy, but nothing unusual considering the time of year and "in view of the fact that this is Coos

County.'' One witness, who had resided in the vicinity for six years, testified that they had a rain like that four or five or six times a year. Another testified that the rainfall was very heavy for several days, but that he had seen it rain that hard any number of times. With a normal run-off when it was raining hard, he said the ravine carried a stream of water four feet wide and six inches deep.

Edwin J. Throckmorton, a former owner of plaintiffs' property, had visited the premises about three weeks before the catastrophe. He testified that at that time the ravine was full of brush and debris, consisting of tree tops and limbs, in excessive quantities. He visited the premises again within a day or two after the event, and found thereon a considerable quantity of very soft mud on which there were resting and embedded a great number of logs of all sizes, some quite large, and some small stuff from six to twelve inches in diameter, tops of limbs, and debris of all descriptions, including some logs three feet in diameter or possibly larger. Where the Honig cabin had stood, or very near there, there was quite a large pile of logs. It was resting on mud, and there was some mud on the pile, but it was certainly not covered with mud or dirt. Logs and debris from both cabins were strewn along the shore line of the little bay, both in the water and on the beach. Two timber pilings which had stood in front of the cabins had been snapped off.

Clyde Dahl, who lives within a quarter of a mile of the property and is familiar with it, visited the premises the next day after the disaster. He found the shore line in front of where the cabins had been ''full of logs and everything, way out in the lake, broken logs.'' There had been no logs there before the cabins were

destroyed. There were piles of logs scattered all over, fairly close together. He saw some earth, but not to amount to anything.

J. W. Sayre, another former owner, visited the property the second day after the event. He said that the bottom of the draw was absolutely clear. Everything had been washed out of it, and there were large logs that had been washed out too. He had observed those logs previously. They had lain with one end down into the draw and the other up on the side hill. On the cleared spot below the ravine there were two piles of logs. "The thing had flowed out and there was quite a layer of soft mud through the center, and these piles of logs had separated and one of them had fallen on our cabin and crushed it to the ground, it looked like it had come in there pretty high because it crushed the cabin forward and down, * * *." One of the piles was higher than his head, probably seven or eight feet. There were a lot of logs out in front on the shore line. He walked on one that possibly was three feet through, right out in front of where the cabins had been. He saw indications of a water line on the sides of the draw, upon the limbs and so forth, where they had been scraped, and there were branches that had hung up on the trees. From the bottom of the gully, he would say, the water came out of there at least ten or twelve feet deep.

DeWitt Honig, one of the plaintiffs, visited the property the third day after the event. He testified that one cedar log that he had observed up the canyon was lying on top of the pile toward the back side. There were lots of logs there, and not very much dirt. The dirt, what there was, was between where the cabins had been. On the other side there was very little dirt. There

was one pile of logs eight or twelve feet high. He could not reach to the top of them. None of those logs were on the property prior to the washout. There was some dirt on the bottom logs of the piles, and between the two cabins where it had washed out through the draw.

Mrs. Clara A. Honig, one of the plaintiffs, testified that the sides of the ravine were washed quite a ways up, about 12 feet on each side of the bank.

Mrs. Lulu Schweiger, another plaintiff, testified that a pile of logs that was left on Mr. Honig's property consisted of 12 to 16 large trees piled up about 15 feet high. There was no dirt upon them. One could see the water mark where the crest of the water had been, especially on the steep side of the ravine, and she would say that it was 12 to 15 feet high.

■ Taking into consideration the heavy rainfall which is normal in the area involved in this case, it is impossible to conclude from the evidence that that which immediately preceded the disaster was at all extraordinary. It was a heavy rain, but not of unprecedented proportions. In its occurrence and magnitude, it might have been anticipated by a person of reasonable prudence. 56 Am Jur, Waters, § 91. An extraordinary flood is one "whose comings are not foreshadowed by the usual course of nature, and whose magnitude and destructiveness could not have been anticipated or provided against by the exercise of ordinary foresight." 13 Am. & Eng. Enc. Law, 2d ed, p 687; *Jefferson v. Hicks,* 23 Okla. 684, 102 P. 79, 24 L.R.A., (N.S.) 214, 218. See also *Allen v. K. P. Timber Co.,* 152 Or. 176, 181, 53 P. 2d 29.

■■ In this connection, the burden was upon defendants to establish their affirmative defense that the damage was due solely to an act of God. *Tope v. King*

*County,* 189 Wash. 463, 65 P. 2d 1283, 1287. It is apparent that the damage caused by the mud deposited upon the premises was not the principal item for which the actions were brought. The principal item was the destruction of the cabins. The evidence indicates that this destruction was caused by the cabins being demolished by the movement of the logging debris. It would seem, therefore, that, even assuming that there was a landslide, the negligence of the defendants in permitting an accumulation of logging debris to remain on their land might well have been a cause concurring with the landslide in bringing about the injury, in view of the tendency of the soil to slide when saturated with water. Act of God, under those circumstances, would not be a defense. *Piqua v. Morris,* 98 Ohio St., 42, 120 N.E. 300, 7 A.L.R. 129, 132.

The defendants argue that the facts are as consistent with their theory of the case as with the plaintiffs', and therefor that the plaintiffs should have been nonsuited. *Goldfoot v. Lofgren,* 135 Or. 533, 544, 296 P. 843; *Lippold v. Kidd,* 126 Or. 160, 170, 269 P. 210, 59 A.L.R. 875; *Annereau v. Ewauna Box Co.,* 176 Or. 509, 516, 159 P. 2d 215. It must be conceded that, if the injury may have been due to one of several causes, any of which may have been the sole proximate cause, there can be no recovery unless it is shown that, as between the causes in question, it was the negligence of the defendant that brought about the injury. *Lippold v. Kidd,* supra, at p 170; *Goldfoot v. Lofgren,* supra, at p 545. A plaintiff is not required to establish with certainty the proximate cause of his injury, however, and it is sufficient if the proof shows that, of various possible causes shown by the evidence, the one for which the defendant was responsible was the most probable. *Lippold v. Kidd,* supra; *Goldfoot v. Lofgren,*

supra; *Cowgill v. Boock,* 189 Or. 282, 218 P. 2d 445, 449.
We are satisfied that there was substantial evidence
tending to show that the proximate cause of the injuries
suffered by plaintiffs was a flood, of the intensity
usually characterized as "a wall of water", emerging
from the ravine. While it would have been improper
to have permitted the jury to speculate upon the causes
of this flood, *Holmberg v. Jacobs,* 77 Or. 246, 251, 150 P.
284, Ann. Cas. 1917D 496, plaintiffs were not obliged to
prove their allegations of negligence by direct and posi-
tive evidence. *Geldard v. Marshall,* 43 Or. 438, 444, 73
P. 330. Circumstantial evidence was sufficient, and it
was competent for the jury to base its verdict upon in-
ferences logically deduced from the facts proved. *Car-
roll v. Royal Mail Steam Packet Co.,* 130 Or. 294, 299,
279 P. 861. From the visible circumstantial evidences of
a flood to which the plaintiffs' witnesses testified, the
jury was authorized to determine that there was a rea-
sonable probability that plaintiffs suffered the in-
juries of which they complained through the negligence
of defendants as alleged. *Bevin v. O.-W. R. & N. Co.,*
136 Or. 18, 24, 298 P. 204; *Silver Falls Timber Co. v.
Eastern & Western Lumber Co.,* 149 Or. 126, 203, 40
P. 2d 703; *Cowgill v. Boock,* supra, 218 P. 2d 445, 449;
38 Am Jur, Negligence, § 333. In *Crawford v. Cobbs
& Mitchell Co.,* 121 Or. 628, 635, 253 P. 3, 257 P. 16, an
action in which the plaintiff recovered damages for
injury to property through the sudden release by the
defendant of an excessive amount of water impounded
in a reservoir on the Siletz River, it was contended by
the defendant that, because various other concurrent
factors might have caused the injury complained of,
the submission of the case to the jury was an invita-
tion to decide it upon mere speculation. Among the
concurrent factors were "a tremendous and unusual

storm" in the area, with rainfall so heavy that it caused such a great rise in the water of the river that, if not unprecedented, it was without precedent in recent years; a highly swollen stage of water in several tributary streams below defendant's dam; and a landslide of several acres in extent, which, it was contended, had a tendency to divert the river water from its usual channel over and against plaintiff's land. "But all of these matters, of course," said Mr. Justice McBRIDE, "were proper questions for the jury, and we do not think the consideration of their effect was wholly speculative, or that it reduced the question of what particular cause produced the injuries to plaintiff's property to a matter of mere speculation." On rehearing, Mr. Justice BROWN said that it was beyond question that plaintiff sustained injury by the flood waters, but that as to whether his injury was caused by the negligence of the defendant was, in the mind of the Justice, a grave question. In holding, however, that there was some evidence in support of each of the several material allegations of the complaint, he said, in part:

"'* * * Under the rules of evidence, the jury had the power to accept, or to reject, in whole or in part, the testimony of any witness. The jury likewise had a right to infer from the evidence that the defendant released the impounded waters of its artificial lake for the purpose of lowering the waters of the reservoir, and that, in accomplishing its purpose, it acted negligently, and to the injury of plaintiff. * * *'"

The court held that, on passing upon the lower court's denial of the defendant's motions for nonsuit and for directed verdict, it was required to consider all competent evidence in the light most favorable to plaintiff. It was obliged not only to deem plaintiff's

testimony to be true, but also to give him the benefit of every intendment and every reasonable inference that might be drawn therefrom. The case was properly submitted to the jury.

We think that the facts in the present case are not so consistent with defendants' theory as with plaintiffs', and that the proof of causal connection is not equally balanced. Defendants' theory was that the disaster was brought about by a landslide originating on plaintiffs' property, which, by its occurrence, deprived the soil of the ravine of its lateral support and caused a landslide in the ravine. There was, however, no proof of any landslide having originated upon plaintiffs' property. Nor do we think that there was even evidence of a probability of such a landslide, as plaintiffs' property was relatively level ground, having only "a small slope." We are of the opinion, therefore, that the evidence of causal connection preponderated in favor of plaintiffs. From a consideration of the facts and circumstances as a whole, we think that a reasonable inference of defendants' negligence was proper. 65 C.J.S., Negligence, § 243, pp 1067, 1075.

The court submitted the question of proximate cause to the jury under proper instructions. We cannot say, as a matter of law, that the flooding of plaintiffs' premises in the manner alleged was not a natural and probable consequence of the defendants' permitting an accumulation of logging debris to remain in the ravine. *Kukacka v. Rock,* 154 Or. 542, 545, 61 P. 2d 297; *Aune v. Oregon Trunk Ry.,* 151 Or. 622, 631, 51 P. 2d 663. Defendants apparently assume that the impounding, by their logging debris, of the water of the stream which flows in the ravine during the rainy season, was inherently improbable, and was an event

that could not reasonably have been foreseen. The editors of American Law Reports say that it may be laid down as a general rule deducible from the authorities that one through whose fault a stream becomes obstructed by debris or waste material is liable for the damage caused thereby. Annotation, 54 A.L.R. 358. The annotation is appended to the report of *Johnson v. Sultan Railway & Timber Co.*, 145 Wash. 106, 258 P. 1033, 54 A.L.R. 356, 358. In that case, the factual situation bore some similarity to that in the cases at bar. Debris from the defendants' logging operations had been permitted to remain in the bed of a small stream which, during a heavy and unusual rainfall, carried water of a depth of from two inches to two feet. The stream rose, and the water became impounded behind a jam of debris. The jam eventually gave way and permitted a considerable head of water to rush downstream, which broke a dike that plaintiffs had constructed to protect their farm, and flooded the land. The principal defense was that the defendants' logging operations were conducted in the customary manner, and, therefore, that there was no liability in the premises. The court held, however, that the law imposed a liability under such circumstances, regardless of negligence. The case is interesting because of the fact that it shows that it is possible for logging debris to dam the water of a stream. Compare *American Coal Co. v. De Wese* (CA4th), 30 F2d 349, 350, in which the dumping by the defendant of waste material into a natural watercourse brought about an impounding of the water and an eventual sliding or carrying away of the impounding agency, which resulted in the death of several persons. In that case, the defense was made that the defendant's method of dumping waste

material was in accord with the practice commonly followed in the locality. It was held that such a defense was not competent, and that, no matter how well established a custom of that sort might be, it could not excuse the defendant from liability for negligence.

We have held that negligently to permit large quantities of water to be impounded, and, by the breaking of the impounding agency, to be suddenly released, is, from the point of view of legal responsibility, no different in principle from lawfully impounding waters and then releasing them suddenly to another's injury. *Allen v. K. P. Timber Co.,* supra, 152 Or. 176, 180, 53 P. 2d 29. Liability for damage caused by the escape of waters impounded in reservoirs or ponds, according to the overwhelming weight of authority, is dependent upon proof of some act of negligence. Annotation, 169 A.L.R. 523. In this connection the annotation cites, among many American cases, the Oregon cases of *Emison v. Owyhee Ditch Co.,* 37 Or. 577, 62 P. 13, *Crawford v. Cobbs & Mitchell Co.,* supra, 121 Or. 628, 636, 253 P. 3, 257 P. 16 and *Kaylor v. Recla,* 160 Or. 254, 84 P. 2d 495. The same principle being applicable to the present case, the defendants' liability was dependent upon proof of negligence, which proof, in our opinion, was sufficiently furnished.

 The law presumes the exercise of due care. The party charging negligence must establish it by a preponderance of the evidence, and it cannot be predicated upon conjecture, guesswork or speculation. *Simpson v. Hillman,* 163 Or. 257, 363, 97 P. 2d 527. It is objected that there was no proof of the allegation that water was caused to accumulate in the ravine in large pools, and that, because of the steepness of the ravine, such accumulation was impossible. These questions,

however, were properly submitted to the jury. If the jury believed that there was evidence upon the ground tending to prove that a sudden flood had issued from the ravine, it was reasonable for it to have inferred, under all of the circumstances, that such flood could not have resulted from any cause other than the accumulation of water as alleged.

There having been substantial evidence in support of the jury's verdict, we are not permitted to weigh the conflicting evidence or to retry the case. Oregon Constitution, Amended Art VII, § 3; *Woods v. Wikstrom,* 67 Or. 581, 588, 135 P. 192; *Red Top Taxi Co. v. Cooper,* 123 Or. 610, 614, 263 P. 64: *Crawford v. Cobbs & Mitchell Co.,* supra, 121 Or. 628, 638, 253 P. 3, 257 P. 16.

Mr. D. L. Buckingham, mentioned above, was one of defendants' principal witnesses. He was a civil engineer of 33 years' experience, and was familiar with soil and land conditions in Coos County and with landslides and movements of soil. (He died since the trial herein.) He was familiar with the causes and reasons for landslides in the vicinity of Ten Mile Lake. He visited the property about two weeks after the catastrophe. The ravine was bare, the two side slopes showed bare rock, and the lower 150 or 200 feet of the property adjacent to the lake [which would include plaintiffs' property] was covered with soft mud and some brush. Before the disaster, the sides of the ravine had been covered with earth, probably a foot or a foot and a half in depth. Afterwards, it appeared that the earth had been removed for a distance of about 25 or 30 feet up the sides, leaving bare rock. The mud extended from the edge of the lake back over where the cabins had been and to the mouth of the ravine. The

soil was a loose, dark brown top soil, not clay soil. "That type of soil takes up water regularly and in the time of heavy rain becomes more or less fluid. If it rains enough to saturate the soil, it is what we call in a fluid condition and when you get that fluid condition intense enough it starts in to move." Error is assigned upon the court's sustaining an objection to a question propounded to this witness, as follows:

"Q. In your opinion, what did cause the debris from the slashing, and the mud, to come down the ravine, over and across the plaintiffs' property?

"Mr. Franklin: I object to that as calling for a conclusion of the witness.

"The Court: The objection is sustained, that is getting close to the question to be determined by the jury.

"Mr. McKeown: I just want to make this statement—

"The Court: I have ruled, and you have an exception to the ruling, there is no use arguing it."

The defendants contend that the question was competent and should have been allowed. The witness was an expert, qualified to testify upon the subject of interrogation not only by study but by personal experience and observation. §§ 2-203 and 2-228 (9), O.C.L.A.; 20 Am. Jur., Evidence, § 784; *Southwestern Portland Cement Co. v. Kezer,* Tex. Civ. App., 174 S.W. 661, 667; *City of Harlan v. Eversole,* 248 Ky. 131, 58 S. W. 2d 371, 372; *Fort Worth & D. C. Ry. Co. v. Kiel,* Tex. Civ. App., 185 S.W. 2d 144, 147. The court's comment indicating that the question was an invasion of the province of the jury applied a rule which is not favored in Oregon. This court, following Professor Wigmore (7 Wigmore, Evidence, 3rd ed, § 1921, p 18), has held that an expert witness may express an opinion upon the very issue

before the jury, and that it is impossible for his testimony in that connection to usurp the jury's function. *Goldfoot v. Lofgren,* supra, 135 Or. 533, 541, 296 P. 843.

■ We think, however, that the error was not one upon which, in the state of the record, the case should be reversed. The alleged landslide, according to the defendants' pleading, did not originate in the ravine but upon plaintiffs' property. All the evidence, including the testimony of Mr. Buckingham himself, showed that after the disaster plaintiffs' property was covered knee deep with mud. There was no evidence upon the property from which even an expert could have deduced that a landslide had originated there. There was evidence that ground had slid from the sides of the ravine, but a flood might have caused such slipping. Testimony by an expert witness, under the circumstances, that a landslide had originated upon plaintiffs' property, would have been mere speculation. Therefore, even if the reason given by the trial judge for sustaining counsel's objection to the question was not the right one, this court, being unable to say that the error was prejudicial, will not reverse the judgment upon that ground. *Riley v. Good,* 142 Or. 155, 158, 18 P. 2d 222.

■■ Moreover, the question propounded to the witness was not in such a form as to disclose sufficiently precisely what testimony was sought to be elicited. It was a general question as to what caused the debris and mud to come down the ravine. If counsel expected to elicit testimony in support of defendants' affirmative defense, that is, that the cause of the catastrophe was a landslide originating on plaintiffs' property, then, as we have indicated, the testimony, in our opinion, would have been no more than a mere guess, and therefore, at least prima facie, inadmissible. If, on

the other hand, some other answer was anticipated, such as that the landslide originated in the ravine, there was nothing in the question to inform the court as to the relevancy and materiality of such anticipated answer. Under those circumstances, we think that counsel should have made a proper offer of proof, not only to advise the trial court as to his position, but also so that this court on appeal might intelligently pass upon the trial court's ruling. *Ashmun v. Nichols,* 92 Or. 223, 241, 178 P. 234, 180 P. 510; *Bach v. Chezem,* 168 Or. 535, 541, 124 P. 2d 710.

Upon the whole we are of the opinion that the trial was free from reversible error. The judgment is affirmed, with costs.