Goldberg, Appellant, *v.* R. Grier Miller & Sons, Inc.

2

Argued May 22, 1962. Before BELL, C. J., MUS-MANNO, COHEN, EAGEN and O'BRIEN, JJ.

*Richard L. Cantor,* with him *G. Clinton Fogwell, Jr.,* and *Reilly, Fogwell and Lentz,* for appellants.

*Dallett Hemphill* and *Theodore R. Griffith,* with them *M. Carton Dittmann, Jr.,* and *Griffith & Corliss,* and *Ballard, Spahr, Andrews and Ingersoll,* for appellees.

OPINION BY MR. JUSTICE MUSMANNO, June 28, 1962:

The plaintiffs—Harry, Benjamin and William Goldberg—owned a one-story warehouse in West Chester, standing hard by a two-story garage owned by R. Grier Miller and Sons, Inc., which leased the second floor to the Texas Eastern Transmission Corporation. The garage building rose some 13 feet above the crest of the plaintiff's warehouse.

On March 20, 1958, the roof of the garage building collapsed, exerting such a downward force against the eastern wall of the building that it disintegrated, avalanching bricks, beams, trusses and debris on the plaintiffs' warehouse, accomplishing its demolition. The plaintiffs brought suit against the garage owners and the second floor tenant, averring negligence in the construction and maintenance of the garage building, together with lack of care in conducting inspections which would have revealed structural defects. The defendants filed preliminary objections which were dismissed and the case proceeded to trial. The evidence showed that there had been a heavy fall of snow (24 inches) at the time of the collapse of the garage building. The defendants claimed nonliability, asserting that the accident was the result of an "act of God." The jury returned a verdict for the defendants and the plaintiffs appealed.

The appellants contend that the jury was incorrectly instructed in that it was not informed that, when the defendants interposed the defense of "act of God," they had the burden of proof of establishing this supernatural interposition. In other words, they argue that the defense of "act of God" is an affirmative defense which requires the defendant to establish that it was the intervention of the Supreme Being and not the defendant's negligence which brought grief to the plaintiffs.

This case was tried prior to the rendition of our decision in the case of *Bowman v. Columbia Telephone*

*Co.*, 406 Pa. 455, where we said that trial judges should not "place upon juries the awesome and overwhelming duty of deciding whether any particular act was caused by God or by man."

We repeat that recommendation. Although the term "act of God" has been recognized for a long time in the law as a phrase of art, there is no reason why it must continue to be used if good judgment decrees its abandonment. The defendants state that the destruction of the plaintiffs' warehouse was an "act of God." It is a matter of common sense that this is not so. Even to propose it is to suggest what is obviously contrary to fact, theology and jurisprudence. Although judges and lawyers know that the phrase is not intended in its literal sense, all jurors do not know this, and when judges charge that a reputed accident may have been an act of God, there are many jurors who may be so awestricken by the concept of a divine manifestation that they cannot give to the facts the down-to-earth, tangible, mathematical analysis and deliberation which is required for a secular verdict.*

Judges have charged, in accordance with the law in the books, that if the negligence ascribed to the defendant cooperated with an "act of God" to cause the damage complained of, the defendant is liable, but if there was no negligence or the defendant's negligence did not concur with the "act of God" then the defendant is exculpated of all blame and the disaster must be attributed to the Deity alone. (*Carlson v. A. & P. Corrugated Box Co.*, 364 Pa. 216.) There is, or should be something inwardly disturbing about asking a jury to determine what part of an accident was caused by man

---

* There are people who believe that every happening in the world is dictated by the Supreme Being and that therefore what is, is, and could not ever have been otherwise. There are sects so imbued with this concept of the working world that their members refuse even to summon a doctor when ill.

and what part was wrought by the hand of God, and then to apportion the several liabilities. Is this within the capacity of twelve mortal men and women? "Man in his finite mind cannot pass upon the wisdom of the Infinite. There is something shocking in attributing any tragedy or holocaust to God. The ways of the Deity so surpass the understanding of man that it is not the province of man to pass judgment upon what may be beyond human comprehension. There are many manifestations of nature which science has not yet been able to analyze, much less cope with. In any event no person called into court to answer for a tort may find exoneration from the act of negligence charged to him by asserting that it was not he but the Supreme Being which inflicted the wound and the hurts of which the plaintiff complains." (*Bowman v. Bell Telephone Co.,* supra).

To instruct a jury to distinguish between what is commanded by the Lord and what is the result of man's carelessness is to intermingle religious loyalties with earthly considerations in such a manner as to produce results which may satisfy neither Church nor State.

The phrase "act of God" in the sense in which it is interpreted in the legal and commercial world did not have its genesis in the law. It emerged from the chrysalis of the primitive mind groping for comprehension in the primordial misty days when man sought to adjust to the universe and he craved explanation of what to him was unexplainable. In this failure to understand, innate intelligence was supplanted by superstition which proceeded to attribute to the heavens all that could not be spelled out in the blundering, amorphous language of the age. Thus, when the thunder blasted and the horizon cavernously echoed; when the lightning severed the skies in zigzag tumult, man said that God was angry and then if, in the accompany-

ing electric storm, a tree crashed to the ground, man said that the Supreme Ruler had targeted it with a bolt of wrath.

As time passed, persons with cunning and cupidity sought to avail themselves of this superstition in order to avoid a responsibility which was the result of their own failings and neglect. If, for instance, a proprietor neglected to properly maintain a strong bridge over a stream on his land and the bridge broke, drowning a traveler, the proprietor would respond to charges of negligence by stating that rains had swollen the stream and since the rains were caused by God, the proprietor could not be held liable for what God had done.

But the fact is that heavy rains are not so unusual that one cannot anticipate them and prepare against the damage they can wreak. Whether the landowner makes adequate preparation against a predictable heavy storm is always a question of ascertainable fact. The same is true when heavy snows intervene. The person who builds a house in the North Temperate Zone with a roof so feebly constructed and so loosely moored that it will give way beneath the weight of a seasonable accumulation of frozen precipitation, injuring or killing his guest, cannot blame the fall of his roof on Providence and say that the collapse of his house was an act of God.

Nor can he say that since the snow is a fact and the disaster is a fact, this collaboration speaks of what it was beyond his human power to avert. For many centuries there has been a philosophic debate between the respective proponents of determinism and free will, but it should be quite obvious that if there were no free will, there could be no reason for courts since in that event neither plaintiff nor defendant could have done anything to avoid what was already destined to take place. If there were no free will, every criminal penalty would be unjust, and thus even Adolf Eichmann

would have to be a subject of sympathy instead of one of eternal loathing.

Of course, on the other hand, it is a matter of the most elementary knowledge that there do occur manifestations of nature of such unpredictable violence and fury that no man's efforts could prevent them and, in that inability to prevent, there can naturally be no legal responsibility for the damage they inflict. Thus, if a wind of cyclonic proportions uproots a healthy and sturdy oak on A's land and carries it to B's land, damaging his house, A would not be liable to B since there was conceivably (at least in the present state of science) nothing he could do to prevent the cyclone or to anchor the tree. However, if the wind is one which is ordinarily to be anticipated in the season and clime of its occurrence, a different fact-situation presents itself.

In the case of *Fitzpatrick v. Penfield,* 267 Pa. 564, the wall of a building which had been ravaged by fire was allowed to remain upstanding unguarded. A strong wind bore it to the ground, killing the son of the plaintiff playing at its base. The landowner, in answering the charge of negligence in not having taken the necessary safeguards to prevent the wall from collapsing, asserted nonliability because, inter alia, of the intervention of the high wind. Justice KEPHART, speaking for our court, said: "High winds are not of infrequent occurrence, and this particular wind was termed an ordinary wind occurring three or four times in a year. It was not an unusual one and it was for the jury to find under all the evidence whether it was likely to have occurred and should have been provided against. We cannot say that the intervening cause was vis major. One who fails in his duty to remedy a defective or dangerous condition is liable for injuries resulting therefrom although the immediate cause of the injury is the wind . . . The causal connection is not broken

and the original wrongdoer is liable for the injury sustained."

In *Bowman v. Columbia Telephone Co.*, supra, we said: "Whether the intervening cause of an injury is wind, snow, storm or sea, the test in tort cases remains the same: Did the defendant do all that a reasonable person could have been expected to do to avoid the happening which is the cause of the plaintiff's injuries? If he did, he is not liable in damages. If he did not, he is liable."

The defense of vis major has always been and remains a legitimate defense in Pennsylvania. The defense of vis. major encompasses the concept of a natural force of such inevitability and irresistibleness that man cannot cope with it, either to predict it, forestall it, or control it when it arrives to strew the landscape with rack, wreckage and ruin. Judges should have no difficulty in describing these incidents of cosmic convulsion or fierce agitation of the elements, without referring to them as "acts of God."

The English language is rich, not poor. In its vast wardrobe there are words with which to clothe every thought, concept and phenomenal thing so as to make that thing readily identifiable by the jury no matter how lacking in formal or higher education it might be. Thus, we have storms, tempests, tornadoes, cyclones, hurricanes, blizzards, monsoons, typhoons, twisters, siroccos, gales, southwesters, duststorms, snowstorms, sandstorms, whirlwinds, wind eddies, not to mention tidal waves, earthquakes, volcanic eruptions and all the other pyrotechnical spectacles of nature which at times turn the world into a stage of colossal drama, were it not that the resulting human suffering robs the blazing scenes of theatrical perspective.

Not only is there no need, but it is actually confusing, to tell the jury that they must determine whether a given mundane turbulence is an "act of God." The

jury is not chosen to determine what should be rendered unto Caesar and what is to be rendered unto God. The trial judge should instruct the jury that they are to decide whether the alleged blizzard (if a blizzard is blamed for the proved damage), or the cloudburst (if a cloudburst is accused of upsetting the normal state of affairs), or whatever phenomenon in the meteorological armory is accused of doing the damage,— the judge is to direct the jury to decide whether that phenomenon of weather was so unpredictable, so extensive, and so unprecedented in vehemence and destructive fury, that the defendant could not have made preparations to prevent or mitigate the catastrophic effects.

It obviously would be no answer, for instance, against a charge of negligence for a shipowner to say, in the event of the foundering of his vessel with loss of life and cargo, that he never expected that the ship would enter into a storm which would bring the water above certain gaping holes in the hull of his craft since he is required to know that the surface of the sea, lake or river on which he is to navigate, could rise, on account of winds or currents, above the normal waterline.

Nor is it any answer against a charge of negligence for the owner of a building in Pennsylvania merely to say that snow accumulated on its roof and this caused it to collapse. In Pennsylvania snow in the wintertime is to be expected as certainly as flowers bloom in the spring. The question which arises is: Was the snow of such volume and unpredictable height or depth that the building owner could not have anticipated so arctic a demonstration and therefore could not have been expected to prepare against it?

What must be kept constantly in mind, in cases of this character, is that if the defendant urges the interposition of ravaging terrestrial forces, speaking through

the awesome and gigantic megaphones of rain, snow, sleet, ice, storm, tempest or hurricane, he must prove his assertion. If, as in the case at bar, he claims that there fell a snow of such height, weight and burden that no normal knowledge or vision would have foreseen it and, therefore, there would have been no need to build a roof of maximum massiveness to counteract and protect against so unimaginable a snow, he must prove that claim.

Anyone who sows the seeds of a whirlwind in his allegata must prove it in his probata. Anyone who asserts a cyclone must be prepared to prove a cyclone. Anyone who is charged with so negligently maintaining his property that it brought damage to another, and who, against that claim, defends that the fault was not his but that of an earthquake or volcanic eruption or flood or storm of such vastness and severity that care and concern could not provide against it, has the burden of proving that defense, because it is an affirmative defense.

Unless the defendant in actions of this character proves to the contrary, it will be assumed that in Pennsylvania snows, rains and storms are to be expected in their seasonal cycles and that every property owner has the responsibility of exercising reasonable care to protect against the results of what ordinarily appears on the meteorological stage of the North Temperate Zone.

The appellants in this case assert that the jury was not instructed to this effect. The charge of the trial court, as it appears in the record, is an excellent and exhaustive one in its delineation of the law and its application to the facts, but it does omit the vital instruction indicated. It comes close to what is required but it just falls short of putting an authoritative roof on the edifice of an otherwise most able charge. The court said: "They [the defendants] also have a further de-

fense, members of the jury, that this was not an ordinary storm, that this was an extraordinary storm that they should not have been able to foresee and, therefore, the storm was the overwhelming force and would have caused this injury regardless of the fact that they may or may not have been negligent and, therefore, under both those circumstances they say that a verdict should be rendered in their favor. If you so decide under the facts, you may find in their favor."

A slight alteration of the last sentence would have supplied the deficiency, namely, "The defendants have the burden of proof of showing that this was an extraordinary storm, one that could not have been foreseen, and that it was this overwhelming force which caused this injury; and if you find they have met that burden, you will find in their favor."

As recently as 1956, this Court said in the case of *Yenchko v. Grontkowski*, 385 Pa. 272: *"It is the burden of the party asserting an act of God as a defense to come forward with the proof as to its effect.* Unless he does so, the act of God avails him nothing if his negligent conduct contributed to the damage." (Emphasis supplied).

The rule is followed in many other jurisdictions. An article in 29 ALR 2d 435, using *Schweiger v. Solbeck*, 191 Or. 454, 230 P. 2d 195, as its basic case, states that: "An extraordinary flood, amounting to an act of God, is one whose comings are not foreshadowed by the usual course of nature, and whose magnitude and destructiveness could not have been anticipated or provided against by the exercise of ordinary foresight.

"The burden is on the defendant, in an action for damage by flooding, to establish the affirmative defense that the damage was due solely to an act of God."

Obviously what is there said about the results of an extraordinary flood would apply to any other de-

bacle of magnitude following in the wake of any other supernormal deviation from the usual and expected operation of the machinery of the universe.

Judgment reversed with a venire facias de novo.

Mr. Justice COHEN dissents.

Mr. Justice BENJAMIN R. JONES took no part in the consideration or decision of this case.