Argued January 9, affirmed March 7, 1974

# HICKMAN, *Respondent, v.* HAUGHTON ELEVATOR COMPANY, *Appellant.*

519 P2d 369

*John R. Bakkensen,* Portland, argued the cause for appellant. On the briefs with him were Miller, Anderson, Nash, Yerke & Wiener, Portland.

*Gerald R. Pullen,* Portland, argued the cause and filed the brief for respondent.

TONGUE, J.

This is an action for damages for personal injuries allegedly sustained when plaintiff's arm was struck by the door of a service elevator at the new St. Vincent's Hospital near Portland. The elevator had been provided and installed by defendant, which also had a contract with the hospital for its regular inspection, repair and maintenance.

Plaintiff's complaint alleged breach of implied warranty; res ipsa loquitur; and specifications of negligence. The case was submitted to the jury by a "special verdict" under which the jury found separately in favor of plaintiff on each of these three theories. Defendant appeals from the resulting judgment.

Defendant's primary assignments of error involve the contention that the trial court erred in sub-

mitting the case to the jury on any of these three theories. This requires us to review the evidence. Because the jury found in favor of the plaintiff, she is entitled to the benefit of all favorable evidence, in the event of any conflict in the evidence, as well as all favorable inferences from the evidence. *Gordon Creek Tree Farms v. Layne et al,* 230 Or 204, 218, 358 P2d 1062, 368 P2d 737 (1962).

Defendant is engaged in the business of selling, servicing and repairing elevators. In that capacity it installed this elevator, known as the east service elevator, in the new St. Vincent's Hospital. The elevator was accepted by the hospital on January 29, 1971. On February 19, 1971, defendant and the hospital made an agreement under which, according to the testimony, defendant had the exclusive right to maintain the elevator and agreed to make regular examinations, adjustments and repairs. The elevator was used primarily to transport food from the kitchen to various floors of the hospital and to return the dirty dishes for washing.

Plaintiff was the dietary supervisor of the dish room at the hospital. She testified that on February 7, 1972, she entered the east door of the elevator on the eighth floor and pulled a cart of dirty dishes approximately five feet high and weighing "over 100 pounds" onto the elevator with her. She then pushed the lower level button on the control panel adjacent to the west door, which then closed, but the elevator did not descend.

She stated that she then saw that the east door of the elevator "was slamming almost closed," to a point leaving a "gap" of about a foot and one-half and would then "slam" back, after which it would again

rapidly close to that point and slam back again, as though it was hitting something, and that it opened and closed "very fast" and at a speed faster than she had ever experienced on previous occasions when she had operated that elevator. She then called the operator from the telephone inside the elevator to report that it was not working.

Plaintiff then grasped the edge of the east door with her right hand to hold it open, and pushed the cart out with her left hand. She testified that she could feel the force of the door against her right hand as it tried to close. She also testified that after she got the cart out the door she let go of the door and thought that she had enough time to get herself through the door, but that as she was doing so the elevator door "came closed" and "hit me on the arm" with such force that she "immediately felt numbness and a tingling sensation and pain."

Plaintiff also testified that on previous occasions the "safety guard" of that door would strike and would then "open back up," but would not hurt her, and that there was "no comparison" in the way it did so when operating correctly and the "great force" with which it hit her on this occasion.

Plaintiff immediately reported the accident to her supervisor, who testified that she was a "very good employee, hard working, aggressive person and very nice personality."

On that same day, February 7, 1972, defendant sent a man to check and repair the elevator. The record of his service call on that date stated that "car stuck on 8th floor. Door gib on east door 8th floor loose. Gib screw prevented door from closing. Replaced gib and screws." Two days later he returned on a "call-back"

for the same elevator. The record on that call shows "Hoisting door gibs loose. Tightened and replaced."

The elevator door "gib" is a piece of angle iron attached to the boom of the door, with a nylon "gib"[①] about one-half inch thick which hangs down from the bottom of the door and fits into a "track" so as to "keep the door in the track" as it "moves * * * back and forth."

Defendant offered evidence that on February 10, 1972, three days after the accident and after two service calls to repair the elevator, it was inspected by the State Elevator Inspector and found to be in proper working condition. At that time, however, the state inspector did not know that the elevator had been repaired on February 7.

Defendant also offered evidence of the results of tests made on the elevator after it had been repaired, showing that the elevator door was then exerting between 17 and 19 pounds of thrust, less than the maximum permitted by state law, and that the "closing speed" of the door was 4.4 seconds, or slower than the minimum permitted by state law.

It appears from defendant's testimony, however, that the speed of the door in closing is not "constant," but starts out at its "maximum speed" and then starts slowing down, in three "steps." Defendant's witnesses contended, however, that the speed of the door was controlled by a motor and a "control. series resistor" which would not permit it to close at any faster speed

---

[①] Webster's Third New International Dictionary defines "gib" as a "removable plate of metal or other material * * * machined to * * * afford a bearing surface, or provide means for taking up wear."

and that an obstruction would only stop the door, but could not make it go any faster. They also testified that the rubber "safety edge" and the photo-electric eyes on the edge of the door would have prevented the door from operating in the manner described by plaintiff.

Defendant's witnesses also testified that if a screw holding the "gib" is loose and "digs down" into the track it will "stall the door," and will "more than likely" cause it to "shoot back," or "automatically re-open," and to "try once more." He also testified, however, that this was only a "remote" possibility and that it was "impossible," for various reasons, for the door to close in the manner described by plaintiff.

This witness admitted, however, that if at the time of the accident the elevator door operated in the manner described by plaintiff and hit her arm hard enough to cause the injuries described by her, it would have had to "malfunction," and that if the elevator door operated "normally" it would not have hit her arm hard enough to cause such injuries.

In addition, this witness testified that there was a "history of trouble with both food service elevators" at St. Vincent's due to "willful damage," including evidence that people had kicked the doors. The hospital, however, had no record of any such damage to the elevators. The witness also testified that defendant had "trouble with these elevator doors periodically" for "the first nine or ten months" after installation in early 1971; that after March or April 1972 (after the accident) defendant ceased getting "frequent reports about door problems"; and that if the elevator doors are not "maintained properly" they are "capable of causing injury." Defendant's witnesses maintained, however, that the doors were operating properly at the time of the accident.

On March 10, 1972, defendant was given notice by plaintiff of her claim of breach of warranty. On June 13, 1972, plaintiff filed her complaint in this case.

1. *There was sufficient evidence from which the jury could find that defendant was negligent and that there was a "substantial factor" in causing injury to plaintiff.*

Plaintiff's complaint, in addition to its "count" alleging implied warranty of merchantable quality and in addition to its allegations of "res ipsa loquitur," alleges that defendant was negligent in failing to inspect the elevator for defects and in failing to repair its closing mechanism in such a manner as to prevent its slamming upon plaintiff's arm and shoulder.

Defendant offered "maintenance records" showing that it had made weekly "routine examinations" of the elevators at the hospital, as well as occasional "call-backs for elevator problems" and occasional "scheduled work and repair," which "include[d] cleaning and replacement of worn parts." This included "scheduled work" to "clean doors and tracks" on January 12, 1972 (about four weeks prior to the accident).

As previously stated, these same records also showed a "call-back" on the day of the accident, with the entry: "Car stuck on 8th floor. Door gib on east door 8th floor loose. Gib screw prevented door from closing. Replaced gib and screws."

As also previously stated, there was testimony that there had been a "history of trouble with both food service elevators" and that under its contract with the hospital defendant was paid $1,628.15 per month to "keep these elevators in good workmanlike

repair," including, among other things, the "renew[al of] guide shoe gibs and rollers as necessary to insure smooth and quiet operation." There was also testimony to the effect that if elevators are not maintained properly they are capable of causing injury and that if the door hit the plaintiff with enough force to bruise her arm "that would be a malfunction," although defendant denied that this could have happened.

■ We believe that if the jury believed the evidence it could properly find that if defendant had properly performed its duty to inspect, repair and maintain this elevator door with the care, and in the detail required by this contract it would have discovered that the gib screws were loose and needed to be tightened or replaced before they became so loose as to "prevent door from closing" and cause the elevator car to be "stuck on 8th floor." Thus, we hold that the evidence in this case was sufficient to make it a jury question whether or not defendant was negligent in the performance of its duty of inspection, repair and maintenance.

We also believe that there was sufficient evidence to make it a jury question whether this conduct by defendant was a "substantial cause of the harm." See *Babler Bros. v. Pac. Intermountain,* 244 Or 459, 415 P2d 735 (1966). See also *Hills v. McGillvrey,* 240 Or 476, 482-83, 402 P2d 722 (1965).

We recognize that defendant offered evidence to the effect that it was impossible for the elevator door to malfunction in the manner described by plaintiff and that she was unable to offer any evidence which specifically and directly demonstrated that the loose gib screw caused the elevator door to malfunction in that manner.

Nevertheless, we believe, after examination of the entire record, that there was sufficient evidence from which the jury could properly find that the loose gib screw on the bottom of this elevator door, together with defendant's failure to discover and repair or replace that loose gib screw, was a "substantial factor" in causing the door to malfunction in the manner described by plaintiff, assuming that the jury believed her testimony that it did so malfunction.

Plaintiff offered evidence from which the jury could find that this elevator door was defective in that a screw on the bottom of the gib plate was loose and "dug" into the track on which the elevator door traveled as it closed and that this caused the elevator door to "slam" back and "try again." Although there was no specific evidence that this would cause the elevator door to hit plaintiff's arm with sufficient force to cause the injuries complained of by her, we believe that the jury could have believed plaintiff's testimony that the door hit her with sufficient force to cause that injury and could have properly found that in doing so the door must have "malfunction[ed]"; that it would not have malfunctioned in that manner "but for" the loose screw which caused the door to repeatedly "slam" back and then close again; and that this loose screw, together with defendant's failure to discover and repair or replace it, was at least a "substantial factor" in causing the door to so "malfunction" in that manner.

We also believe that the evidence offered by plaintiff was sufficient to support a finding by the jury that such defect was "attributable to defendant's conduct rather than to some other cause."[2]

[2] Cf. Cowgill, Adm'r v. Boock, Adm'r, 189 Or 282, 291, 218 P2d 445 (1950); Schweiger et ux v. Solbeck et ux, 191 Or 454, 468, 230 P2d 195 (1951); Eitel v. Times, Inc., 221 Or 585, 596-601, 352 P2d 485 (1960).

For these reasons we hold that the trial court did not err in submitting to the jury the specifications of negligence in inspection, repair and maintenance, as alleged in plaintiff's complaint. The case was submitted to the jury under a "special verdict" under which it found, independently, in favor of the plaintiff on each of the three theories alleged in plaintiff's second amended complaint. It thus becomes unnecessary to decide whether, under the facts of this case, it was proper for the trial court to submit to the jury either the theory of implied warranty of merchantability or the theory of res ipsa loquitur, as also alleged in plaintiff's complaint.

2. *The court did not err in rejecting the first verdict returned by the jury.*

Defendant's remaining assignment of error is that the trial court erred in rejecting the first verdict returned by the jury for $7,800 in special damages, with no general damages.

The trial court then told the jury that its verdict was:

"* * * not acceptable in form because it is for an amount of special damages only and this is contrary to the instructions which I gave you with respect to damages."

The jury was then reinstructed on the issue of damages, after which it returned a verdict awarding plaintiff $7,800 in special damages and $1,080 in general damages.

In support of its contention that the trial court erred in rejecting the first verdict defendant says, after a review of our recent decisions on this question, that the first verdict was a proper verdict within the rule

stated in *Saum v. Bonar*, 258 Or 532, 484 P2d 294 (1971). In that case we reinstated a jury verdict of $1 in general damages and $4,443.33 in special damages (including $3,050 for lost wages) in a case in which we found (at 541-42) that:

> "* * * in this case the jury could have found *either* that plaintiff suffered no substantial injuries or that although he suffered some injuries, he was more than properly compensated for any such general damage by payment prior to trial of $3,050 for lost wages which he did not in fact sustain, at least in that amount."

Defendant contends that in this case, as in *Saum*, there was "a reasonable basis for concluding that [plaintiff's] injury, if it existed, was not serious," with the result that the trial court should have accepted the jury's initial verdict under which she would have been awarded no general damages.

The difficulty with defendant's position is that at the time of trial it did not urge the trial court to accept the first verdict of the jury, as it now says the trial court should have done. Instead, at that time defendant moved for a mistrial on the ground that the verdict was defective because "the jury failed to follow the instructions of the court in that no general damages were awarded."

■ Under these circumstances it appears that defendant did not take proper objections or exceptions in the trial court so as to entitle it to contend on appeal that the first verdict was a proper verdict, despite the failure of the jury to award general damages, and that the trial court was guilty of error in failing to accept it.

For all of these reasons, we affirm the judgment of the trial court.

O'CONNELL, C. J., specially concurring.

The majority opinion purports to uphold the jury verdict on the ground that the loose gib was a "substantial factor" in causing plaintiff's injuries. I do not share this view. The only evidence on this issue adduced at trial was to the effect that this gib could not influence the speed with which the door closed. For this reason, I do not believe the jury could conclude that defendant's negligence in failing to detect and repair this part in any way, let alone substantially, contributed to plaintiff's injury, and I find the court's suggestion to the contrary unfounded.

I concur in the result, however, because I believe this is a proper case to apply the doctrine of res ipsa loquitur. Elevator doors do not normally close with the force reported by plaintiff. In a self-service elevator, such force could result only from a mechanical malfunction. The defendant had the exclusive responsibility for inspecting and repairing the mechanical parts of this elevator. Under this set of facts, I believe it is permissible for the jury to infer that the accident was the result of negligence and that the negligence more probably than not was that of the defendant.

Close scrutiny of the majority opinion will reveal, I believe, that in fact my brethren also rely on a res ipsa loquitur analysis and not the "substantial factor" test they purport to apply.

HOLMAN, J., concurs in this opinion.