# IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

## SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

| | | |
|---|---|---|
| METROPOLITAN EDISON COMPANY, | : | No. 58 MAP 2016 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Commonwealth Court dated October |
| | : | 15, 2015 at No. 2188 CD 2014 |
| v. | : | Reversing the Judgment Entered in the |
| | : | Berks County Court of Common Pleas, |
| | : | Civil Division, dated November 17, |
| CITY OF READING, | : | 2014, exited November 19, 2014, at No. |
| | : | 10-21418 |
| Appellee | : | |
| | : | ARGUED: December 7, 2016 |

## OPINION

**JUSTICE DONOHUE**                                          **DECIDED: June 20, 2017**

In this appeal, we are required to construe the language of the utility service facilities exception ("Utility Exception") to governmental immunity contained in the Political Subdivision Tort Claims Act ("Tort Claims Act"), 42 Pa.C.S. § 8542(b)(5). The Commonwealth Court concluded that where a dangerous condition of the facilities of a utility system is created by the negligent action or inaction of a local agency or its employees, the Utility Exception does not apply. Because the Commonwealth Court misconstrued both the Utility Exception and the gravamen of the lawsuit in question, we reverse.

Metropolitan Edison Company ("Met-Ed") provides electricity service to residents of the City of Reading ("City") and surrounding areas within Berks County. As part of Met-Ed's electric utility system, electrical wires are buried underground, along with other

private and municipal utilities, within the City's right-of-way.[1] N.T., 5/19/14, at 17. The wires are encased in sections of terra cotta piping which are cemented together, or Schedule 40 PVC conduit, depending on the age of the installation. Id. at 16-18. The wires and their protective encasement are known as "conduit banks." Id. at 16.

In July 2009, workers from the City's sewer department excavated a site in the vicinity of the 200 block of North 5th Street to gain access to the City's sewer main. As a result of the excavation, a portion of Met-Ed's adjacent conduit bank was exposed. The City's laborers noticed that a section of concrete had fallen off Met-Ed's conduit bank and into the excavation trench. Id. at 142-43. Met-Ed was notified on July 8, 2009 that this incident occurred. On the same day, Met-Ed retained Homan Excavating, Inc. ("Homan") to stabilize and repair the conduit bank.[2] Homan observed that the "dirt conditions" in the hole were "extremely poor", meaning that "the dirt was loose and not very tight, unstable." Id. at 28. Homan did not observe any shoring in the hole, such as hydraulic jacks, plywood, or metal plates, to stabilize the sides of the excavation hole as it was being dug. Id. at 24, 30-31. Homan patched the bottom and the exposed side of the conduit bank with new concrete and completed its repairs on July 10, 2009. Id. at 195. At this point, the conduit bank was secure because it was resting on, and supported by, earth. Id. at 51, 92, 95, 195.

The City resumed its excavation work. On July 15, 2009, Homan received a call from the City raising some concerns about erosion. Homan returned to the site and

---

[1] From the shallowest to the deepest depth, underground utilities are buried in the following order: (1) natural gas; (2) electric and data utilities, such as telephone and cable; (3) water supply mains; (4) storm sewers; (5) sewer mains and lateral lines. N.T., 5/19/14, at 18-19. The utilities are not stacked directly on top of each other in vertical alignment, but are instead staggered horizontally. Id. at 19-20.

[2] Met-Ed does not assert a claim against the City for the collapse of the first section of concrete. Id. at 211.

found that the excavation hole was deeper and the walls were falling in, but Met-Ed's conduit bank was still intact. Id. at 38-39, 44, 100-03. Homan noted that there was no shoring in place to prevent the walls from collapsing and displacing the dirt underneath the conduit bank. Id. at 42. Homan informed the City's officials that the excavation hole had to be backfilled and stabilized as soon as possible to provide sufficient support for the conduit bank. Id.

The City continued excavating, further widening and deepening the hole. The City never installed shoring to support the walls and took no measures to prevent rain water from entering. Id. at 212, 219. Over the weekend, the area experienced heavy rainfall, causing the earth around and underneath the conduit bank to wash away. Id. at 211. On July 20, 2009, Met-Ed was notified by the City that the conduit bank had fully collapsed and was laying at the bottom of the excavation hole. Id. at 44-45, 179. Homan conducted an extensive repair of approximately fifty feet of conduit bank, which involved the removal of the collapsed portions and installation of a new a conduit bank. Id. at 49, 54.

Met-Ed filed a single-count complaint, alleging negligence against the City and seeking $53,000 in damages.[3] Met-Ed averred in relevant part:

> 10. The [City's] excavation activity created a dangerous condition derived from, originating with, or having its sources in the [City's] realty.
>
> 11. The [City's] excavation activity created, amounted to or otherwise constituted a defect of the sewer line, street, and/or real estate controlled by [the City].
>
> *      *      *

---

[3] The parties stipulated that after July 20, 2009, Met-Ed incurred $53,000 in expenses to investigate the damage and make repairs to its underground conduit bank at the site.

15. [T]he excavation activity created a dangerous condition by removing the dirt, stone, rock, earth and other material which was supporting the Met-Ed [conduit] banks.

* * *

18. The City ... by and through its agents, employees or servants, appreciated and understood the dangerous condition caused by the excavation activity which created the hole.

19. The City ... then orally promised to back fill the excavation work immediately to relieve pressure from the [conduit] bank, and restore the proper support to the Met-Ed facilities, and/or otherwise abate this dangerous condition caused by the [City].

20. Despite the oral promises and representations made by the City ... the excavation work was not back filled or otherwise repaired in a timely manner. To the contrary, the excavation work remained untouched for nearly two weeks thereby continuing the dangerous condition of the utility lines.

21. Likewise, the City ... did not timely restore proper physical support through the placement of dirt, stone, rock, earth or other material to the Med-Ed facilities, and/or abate the dangerous condition.

* * *

30. [The City] had a duty to perform its excavation activities in a manner that would not create a dangerous condition by removing the dirt, stone, rock, earth and other material which was supporting the [conduit] bank.

* * *

36. [The City] breached its duty to [Met-Ed] by failing to perform its excavation activities in a manner that would not create a dangerous condition by removing the dirt stone, rock, earth and other material which was supporting the [conduit] bank.

* * *

42. [The City's] excavation activity occurred in a public street or right-of-way pursuant to an agreement, contract or other form of authority or right which had not expired or been otherwise terminated.

Amended Complaint, 12/17/2010, ¶¶ 10-11, 15, 18-21, 30, 36, 42.

At the conclusion of discovery, the City moved for summary judgment, contending that it was immune from liability under the Tort Claims Act, which provides that "no local agency shall be liable for any damages on account of any injury to a person or property." 42 Pa.C.S. § 8541. In response, Met-Ed argued that it set forth a claim for recovery under the Utility Exception in section 8542(b)(5) of the Tort Claims Act, which provides:

> **(b) Acts which may impose liability.**--The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency:
>
> *   *   *
>
> (5) *Utility service facilities.*-- a dangerous condition of the facilities of steam, sewer, water, gas or electric systems owned by the local agency and located within rights-of-way, except that the claimant to recover must establish that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred and that the local agency had actual notice or could reasonably be charged with notice under the circumstance of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition.

42 Pa.C.S. § 8542(b)(5). Based upon the evidence of record and the above-referenced statutory requirements, the trial court concluded that the record raised questions of fact concerning whether the City was immune from suit, and denied the City's summary judgment motion.

Following a non-jury trial, the trial court entered a verdict for Met-Ed. In support of its decision, the trial court relied on Miller v. Pa. Dep't of Transp., 690 A.2d 818 (Pa.

Commw. 1997), which held that a dangerous condition resulting from negligent excavation activities that caused injuries could serve as the basis for application of the Utility Exception. Trial Court Opinion, 1/20/2015, at 5. The trial court found that the City breached its duty to Met-Ed by performing its excavation activities in a manner that created a dangerous condition by removing the dirt, stone, rock and other material without providing proper support or shoring. Id. at 6. The trial court further found that the City had sufficient advance notice of this dangerous condition to permit it to take timely action to install shoring or otherwise stabilize the dirt, rocks and soil located underneath Met-Ed's conduit bank prior to its collapse, and that the City had breached its duty by failing to take the steps necessary to protect against the dangerous condition of the facilities, of which it had notice, prior to the collapse of Met-Ed's conduit bank. Id.

The City appealed to the Commonwealth Court, challenging the trial court's conclusion that the Utility Exception applied. In a published opinion, the Commonwealth Court reversed, agreeing with the City that it was immune from liability. Metropolitan Edison Co. v. City of Reading, 125 A.3d 499, 503 (Pa. Commw. 2015). The Commonwealth Court concluded that the dangerous condition that resulted in Met-Ed's damages did not originate from the City's sewer system facilities. Id. Instead, the intermediate appellate court concluded that the dangerous condition originated from the City's negligent excavation of the material that was supporting the conduit bank. Id. In this respect, the Commonwealth Court found that the case was analogous to Metro. Edison Co. v. Reading Area Water Auth., 937 A.2d 1173 (Pa. Commw. 2007) ("Reading Water Authority"), where local water authority employees struck an underground electric

line with a boring machine. The Commonwealth Court explained its reliance on Reading Water Authority, as follows:

> Here, the trial court noted that the dangerous condition was 'the unstable condition[] of the dirt and soil located underneath Met-Ed's [conduit] bank.' The dangerous condition, however, did not originate from [the City's] facilities. Rather, the dangerous condition derived from the conduct of [the City's] employees during the excavation. Specifically, [the City's] employees removed the soil beneath the [conduit] bank, did not use support or shoring to stabilize the [conduit] bank, and did not promptly backfill the excavation hole. In this respect, the instant matter is analogous to [Reading Water Authority], wherein the conduct of the water authority's employees created the dangerous condition.

Metro Edison, 125 A.3d at 503. In the Commonwealth Court's view, if a local agency or its employees create a dangerous condition of a utility service facility, the Utility Exception does not apply. Id.

We granted allocatur to consider the following question presented by Met-Ed:

> Did the Commonwealth Court err in holding that the City of Reading was immune from liability for property damage caused by [the City's] negligent conduct despite the Utility Service Facilities exception to governmental immunity contained within the Tort Claims Act, 42 Pa.C.S. § 8542(b)(5)?

Metro. Edison Co. v. City of Reading, 138 A.3d 608 (Pa. 2016) (per curiam).[4]

Met-Ed asserts that the Commonwealth Court erred in concluding that the Utility Exception did not apply. It submits that a local agency such as the City is not entitled to immunity where there is a dangerous condition of the facility and located within its utility

---

[4] Whether the City is immune under the Tort Claims Act is a pure question of law. Our standard of review is de novo, and our scope of review is plenary. Christy v. Cranberry Volunteer Ambulance Corps, Inc., 856 A.2d 43, 46 (Pa. 2004). This is also our standard and scope of review for statutory interpretation. Bowling v. Office of Open Records, 75 A.3d 453, 466 (Pa. 2013)

right-of-way, if the plaintiff shows that the dangerous condition created a reasonably foreseeable risk and that the agency had notice of the dangerous condition. Met-Ed's Brief at 20. Met-Ed argues that the evidence introduced at trial established that the loose and unstable soil and dirt in the excavation hole "constituted a 'dangerous condition' of [the City's] sanitary sewer utility service facilities." Id. Met-Ed argues that this "dangerous condition' derived from, originated or had as its source the physical condition, i.e., the loose and unstable soil, rocks, etc., of [the City's] sanitary sewer utility service facility in the form of the strip of land located within the sanitary sewer's right of way." Id. Met-Ed contends that the City was negligent in failing to take appropriate steps to ensure adequate soil support existed for Met-Ed's conduit bank and allowing the dangerous condition to exist. Id. at 21. Met-Ed asserts that the evidence established that the City had actual notice of the dangerous condition, but failed "to take any active or prophylactic measures whatsoever to protect against the dangerous condition, such as installing shoring devices to prevent erosion of the unstable soil supporting Met-Ed's conduit bank." Id.

Met-Ed further contends that the Commonwealth Court erred in finding that the Utility Exception does not apply because the City's employees created the dangerous condition. Met-Ed submits that the Commonwealth Court's conclusion conflicts with its previous holdings in Miller and DeTurk v. South Lebanon Township, 542 A.2d 213 (Pa. Commw. 1988), which establish that a local agency's affirmative conduct can create the dangerous condition of its facilities necessary to bring the local agency's negligent conduct within the Utility Exception. Met-Ed's Brief at 27. Met-Ed argues that the Commonwealth Court's reliance on Reading Water Authority was misplaced because the proximate cause of the damages in that case was not a defect in the utility service facility or the strip of land contained within the water authority's right-of-way. Id. at 40.

Lastly, Met-Ed contends that the Commonwealth Court's decision renders illusory multiple exceptions to governmental immunity because any time a court can trace the creation of a dangerous condition to a local agency's negligent act or omission, the local agency will be immune from liability. Id. at 44. Met-Ed argues that nearly every aspect of the existence of a utility service facility (or of a local agency's street or sidewalk) can ultimately be traced back to some form of negligent action or omission of the local agency or its employees. Id. Under the Commonwealth Court's decision, no liability will ever attach for any dangerous conditions whose existence can be traced back to those actions or omission. Id.

The City argues, conversely, that the Commonwealth Court properly construed Met-Ed's negligence claim as originating or deriving from the City's negligent excavation activity; not from the loose and unstable soil and dirt in the excavation hole. City's Brief at 10. The City reasons that its negligent excavation activity was the root cause of the collapse because, without the City's negligence, the conduit bank would have never been exposed and the lack of support underneath the conduit bank would never have become relevant. Id. The City contends that the Commonwealth Court's decision was consistent with Reading Water Authority, which held that for the Utility Exception to apply, the dangerous condition alleged must have derived or originated from, or had as its source the local agency's realty. Id. at 11.

The City next contends, to the extent that the unstable soil in the excavation hole caused the conduit bank to collapse, there was no evidence to establish that the City was responsible for putting the allegedly unstable fill beneath the conduit bank or that the City negligently chose to use the wrong fill. Id. at 13. The City asserts that it should not be held responsible for the loose and unstable soil and dirt in the excavation hole without evidence that it was the one responsible for its placement there. Id. at 13. The

City claims that under Met-Ed's logic, regardless of what entity puts the unstable fill in the excavation area, it becomes the City's fill because it is located in the City's right-of-way. Id.

The issues presented here require us to apply principles of statutory interpretation to "ascertain and effectuate the intention of the legislature" with respect to the proper application of the Utility Exception. 1 Pa.C.S. § 1921(a); Allstate Life Ins. Co. v. Commonwealth, 52 A.3d 1077, 1080 (Pa. 2012). The best indication of the General Assembly's intent is the plain language of the statute. See, e.g., Bayada Nurses v. Dept. of Labor and Indus., 8 A.3d 866, 880 (Pa. 2010). "When the words of a statute are clear and free from all ambiguity, they are presumed to be the best indication of legislative intent." Chanceford Aviation v. Chanceford Twp. Bd. of Supervisors, 923 A.2d 1099, 1104 (Pa. 2007). A statute should be construed, to the extent possible, to give effect to all of its provisions, and thus, "it is axiomatic that in determining legislative intent, all sections of a statute must be read together and in conjunction with each other, and construed with reference to the entire statute." Hoffman Min. v. Zoning Hearing Bd., 32 A.3d 587, 592 (Pa. 2011). The General Assembly intended to exempt local agencies from immunity only in specifically defined situations, White v. Sch. Dist. of Philadelphia, 718 A.2d 778 (Pa. 1998), and thus we must narrowly construe and strictly interpret the exceptions in section 8542.

The relevant statutory language is as follows:

> **(a) Liability imposed.**--A local agency shall be liable for damages on account of an injury to a person or property within the limits set forth in this subchapter if both of the following conditions are satisfied and the injury occurs as a result of one of the acts set forth in subsection (b):
>
> > (1) The damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not

having available a defense under section 8541 (relating to governmental immunity generally) or section 8546 (relating to defense of official immunity); and

(2) The injury was caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties with respect to one of the categories listed in subsection (b). As used in this paragraph, "negligent acts" shall not include acts or conduct which constitutes a crime, actual fraud, actual malice or willful misconduct.

**(b) Acts which may impose liability.**--The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency:

\*　　　\*　　　\*

(5) *Utility service facilities.*-- a dangerous condition of the facilities of steam, sewer, water, gas or electric systems owned by the local agency and located within rights-of-way, except that the claimant to recover must establish that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred and that the local agency had actual notice or could reasonably be charged with notice under the circumstance of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition.

\*　　　\*　　　\*

**(c) Limited definition.**--As used in this section the amount of time reasonably required to take protective measures, including inspections required by law, shall be determined with reference to the actual equipment, personnel and facilities available to the local agency and the competing demands therefor.

42 Pa.C.S. § 8542(a), (b)(5), (c).

We begin with section 8542(a), which provides that a local agency may be liable for damages to a person or property if (1) the damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not having available an immunity defense; (2) the injury was caused by the negligent acts of the local agency or its employee; and (3) the negligent acts causing the injury are of the sort set forth in section 8542(b). 42 Pa.C.S. § 8542(a); Falor v. Sw. Pennsylvania Water Auth., 102 A.3d 584, 586–87 (Pa. Commw. 2014). Section 8542(b) lists eight negligent acts by a local agency or its employees that may result in liability. 42 Pa.C.S. § 8542(b). Of the eight, four subsections identify particular negligent acts that may result in liability, including the negligent "operation of any motor vehicle," and the negligent "care, custody or control" of personal property of others, real property in the possession of the local agency, and animals in the possession or control of the local agency. 42 Pa.C.S. § 8542(b)(1), (2), (3) and (8).

The remaining four subsections in 8542(b) waive governmental immunity where injury results from "a dangerous condition of" trees, traffic controls and street lighting; utility service facilities; and sidewalks. 42 Pa.C.S. § 8542(b)(4)-(7). These four subsections, unlike their counterparts, do not expressly articulate specific conduct that forms the basis for a negligent act triggering an exception from immunity. Instead, these four subsections refer to "dangerous conditions of" types of property owned by, or in the possession or control of, a local agency. Id. The existence of a dangerous condition, in and of itself, is not a negligent act. Each of these four subsections, however, contains identical language that permits an inference to the negligent act designated by each subsection. Specifically, after identifying the dangerous condition at issue, each subsection provides as follows:

> …except that the claimant to recover must establish that the
> dangerous condition created a reasonably foreseeable risk

of the kind of injury which was incurred and that the local agency had actual notice or could reasonably be charged with notice under the circumstance of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition.

Id. Section 8542(c) then demarcates the amount of time that must reasonably be afforded to local agencies to remediate against the specified dangerous condition. 42 Pa.C.S. § 8542(c).

This language in sections 8542(b)(4)-(7) and (c) implicitly identifies the negligent acts triggering these four exceptions: where a local agency has notice of (or can reasonably be charged with notice of) a dangerous condition of property it owns (or is in the possession or control of), and where there is a foreseeable risk of the kind of injury that later in fact occurs, the local agency is negligent if it fails to take the necessary remedial measures to protect against the dangerous condition that eventually results in injury and damages.[5] 42 Pa.C.S. § 8542(b)(4)-(7). In determining whether the notice period in advance of the injury was a sufficient amount of time for the local agency to have remediated the dangerous condition, consideration must be given to the equipment, personnel and facilities then available to the local agency as well as the competing demands therefor. 42 Pa.C.S. § 8542(c).

---

[5] We note that damages resulting from the failure of a property owner, who knows or should know of a dangerous condition of his property and who fails to exercise due care to prevent a foreseeable harm from said dangerous condition, have long been recoverable under the common law of this Commonwealth. See, e.g., Fitzpatrick v. Penfield, 109 A. 653, 657 (Pa. 1920); Bowman v. Columbia Tel. Co., 179 A.2d 197, 201 (Pa. 1962).

Based upon this review of the relevant statutory language, we may thus precisely list the requirements for an exception from governmental immunity under the Utility Exception in subsection 8542(b)(5).

- a dangerous condition of a utility service facility owned by the local agency and located within rights-of-way;

- the dangerous condition created a foreseeable risk of injury of the kind of injury that later occurred;

- the local agency had notice of the dangerous condition or could reasonably be charged with notice;

- despite said notice, the local agency, with the means and personnel to do so under the circumstances presented, failed to take necessary and appropriate remedial measures to protect against injury resulting from the dangerous condition; and

- the failure to remediate the dangerous condition was a proximate cause of the injury and resulting damages.

In the present case, the trial court did not err in entering a verdict for Met-Ed. The trial court identified a dangerous condition of the City's facilities and located within its right of way,[6] namely, unstable dirt and soil in the excavation hole resulting in a lack

_____

[6] In Miller, the Commonwealth Court ruled that the Utility Exception applies "not only to the water pipes but also to the strip of land that the [a]uthority disturbed to repair its water pipe." Miller, 690 A.2d at 820. In Miller, the plaintiffs asserted that the phrase "of the facilities" refers not only to the water pipe but encompasses the repairs as well, including the trench. Id. The Miller court relied on County of Allegheny v. Dominijanni, 531 A.2d 562 (Pa. Commw. 1987), which held that the phrase "located within rights-of-ways" in the Utility Exception "refers to the strip of land on which the local agency has constructed its utility service facilities." Id. at 565. The Miller court concluded, based on Dominijanni, that the phrase "of the facilities...and located within rights of way" applies "not only to the water pipes but also to the strip of land which the [water authority] disturbed to repair its water pipe." Miller, 690 A.2d at 820.

In its appellate brief filed with this Court, the City asks us to overrule Miller on this point. It is not entirely clear, however, why the City wants us to do so. The City does not (continued...)

of ground support for Met-Ed's conduit bank. Trial Court Opinion, 1/20/2015, at 5-6. The trial court further found that the City had notice of the dangerous condition and understood the risk of collapse of the conduit bank. Id. at 6. Finally, the trial court determined that the City had breached its duty to Met-Ed by failing to take necessary remedial measures to protect against the dangerous condition of the facilities in advance of the subsequent collapse of the conduit bank. Id.

The Commonwealth Court erred in reversing the trial court's decision. The Commonwealth Court regarded the cause of the collapse to be the direct negligence of the City's employees (not any dangerous condition of the utility service facilities) because the City's employees created the dangerous condition during their excavation activities. By focusing on the **cause of the dangerous condition**, i.e., the negligent excavation, **rather than on the cause of the collapse**, i.e., the failure to remediate the dangerous condition, the Commonwealth Court misconstrued the Utility Exception and the gravamen of Met-Ed's complaint.[7] Contrary to the Commonwealth Court's

---

(...continued)
suggest here, and it did not assert below, that the excavation site was not part of its sewer facilities located within its right-of-way. Instead, the City apparently believes that Miller subjects a local agency to the Utility Exception for negligent excavation activities. The City contends here, as it did before the Commonwealth Court, that "[i]n Miller, the court held that a job site becomes a dangerous condition of the utility service facility when negligently backfilled," and that Miller should not be interpreted "as creating a cause of action for negligent backfilling." City's Brief at 12-13.

We do not read Miller as creating a cause of action against a local agency for negligent backfilling of an excavation trench. The Miller court instead merely recognized that "the common thread running throughout these exceptions is that liability depends first on the strictly legal determination that the injury was caused by a condition of the property, itself, which has its origin or source in the property." Miller, 690 A.2d at 820-821.

[7] The City argues that in order to pierce the City's immunity, Met-Ed was required to utilize the same alleged negligence to establish both common law negligence and the (continued...)

construction, the fact that the City's employees created the dangerous condition by negligent excavation does not render the Utility Exception inapplicable. As our above analysis reflects, the originating cause of the dangerous condition, whether by the negligence of the local agency or otherwise, is irrelevant to a proper application of the Utility Exception. Instead, the negligent act necessary to trigger the Utility Exception is the failure of a local agency to remediate a dangerous condition of which it has notice.

Our decision in Gall by Gall v. Allegheny County Health Department, 555 A.2d 786 (Pa. 1989), further establishes this point. In that case, the plaintiffs became ill when they drank tap water contaminated by giardia. In their suit against the city and the local water authority, the plaintiffs alleged that the city and water authority had "failed to

---

(...continued)
Utility Exception. City's Brief at 13 n.2. The City contends that Met-Ed's allegations of common law negligence referred to the actions of the City's employees (the failure to timely respond, failure to shore, etc.), but then relied on the unstable soil (for which Met-Ed does not point to any negligence) to establish the Utility Exception. Id.

This argument is without merit as it misconstrues the nature of Met-Ed's claims. In paragraphs 18-21 of its amended complaint, Met-Ed alleged that the City had actual notice of the dangerous condition at the excavation site, orally promised to back fill the excavation work immediately to relieve pressure on the conduit bank, but then did not "timely restore proper physical support through the placement of dirt, stone, rock, earth or other material to the Med-Ed facilities, and/or abate the dangerous condition." Amended Complaint, 12/17/2010, ¶¶ 18-21.

We note that Met-Ed also alleged that the City's negligent excavation created the dangerous condition. Id., ¶¶ 11, 15, 30, 36. Met-Ed's decision to do so may have been based upon prior Commonwealth Court decisions suggesting that a local agency must **both** create the dangerous condition and then fail to remediate it. See Miller, 690 A.2d at 819; DeTurk, 542 A.2d at 215. As our above analysis reflects, whether the local agency's negligence creates the dangerous condition is irrelevant for purposes of application of the Utility Exception.

To the extent that the trial court's decision and/or the Commonwealth Court's decisions in Miller and DeTurk can be read to require that **two** negligent acts are required for application of the Utility Exception (the first in creating the dangerous condition and the second for failing to remediate it), those decisions were in error.

utilize the latest scientific developments used to treat and cure water, ... and permitted water retaining systems and water piping systems to become contaminated by giardia." Id. at 787. The trial court sustained preliminary objections filed by the city and water authority, and the Commonwealth Court affirmed.

This Court reversed, holding that the plaintiffs had sufficiently alleged a dangerous condition of the water facilities, of which the city and water authority had actual notice or constructive notice. Id. at 788. For this reason, we found the Utility Exception to be applicable.

> By the plain reading of the statute, a local agency does not enjoy governmental immunity where there is a dangerous condition of the water facilities located within rights of way if the claimant establishes "that the dangerous condition created a reasonably foreseeable risk ... and that the local agency had actual notice or could reasonably be charged with notice ... of the dangerous condition."

Id. Critically, in Gall by Gall this Court did not even mention the lower courts' findings that the water contamination was caused by a series of negligent acts by the city and water authority. Rather, we focused on whether the plaintiffs' injuries were caused by a dangerous condition of the city's water system facilities, which the water authority, after reasonable notice, failed to remediate. Id.

The Commonwealth Court's decision to rely on its prior decision in Reading Water Authority was misplaced as that case is inapposite. There, a municipal water authority's employees struck and damaged the plaintiff's underground electrical wires with a boring machine.[8] Reading Water Authority, 937 A.2d at 1174. The plaintiff

---

[8] The City's contends that it is illogical that it would be immune from liability for actually striking Met-Ed's facilities as in Reading Water Authority yet not immune when it (continued...)

brought a claim against the water authority, which, in turn, asserted its government immunity under the Tort Claims Act. Id. The trial court granted the water authority's motion for summary judgment, rejecting the plaintiff's contention that its claims fit within the Utility Exception. On appeal, the Commonwealth Court affirmed, concluding that the plaintiff did not allege that the dangerous condition derived from the water authority's water line. Id. That is, its complaint failed to make any allegations regarding a defect of the property involved. Id. Rather, the plaintiff alleged that the water authority "breached its duty of care under the [Tort Claims] Act because it failed to exercise due care and take reasonable steps to avoid damaging [the plaintiff's] property while excavating with a boring machine." Id. The Commonwealth Court concluded, "Clearly, the dangerous condition, as alleged, originated with the conduct of [the water authority's] employees." Id.[9]

For the foregoing reasons, the Commonwealth Court erred in reversing the trial court and concluding that Met-Ed failed to establish a claim under the Utility Exception. We find that, contrary to the Commonwealth Court's analysis, under the Utility Exception the focus must be on whether the injuries alleged were caused by a dangerous condition which derived from, originated from or had its source in the local

_____

(...continued)
excavates around them. City's Brief at 6. Illogical or not, the distinction is based on a legislative grant of immunity in the former situation and not in the latter.

[9] Unfortunately, the Reading Water Authority court did not frame its decision based on the clear disqualifying circumstance that no injury was caused as a result of the dangerous condition of the water authority's facilities. Instead, the court opined that the dangerous condition, as alleged, originated with the conduct of the water authority's' employees. Contrary to the statement of the Reading Water Authority court, striking an electrical line with a boring machine is not a "dangerous condition" of anything. It is negligent conduct immunized by the Tort Claims Act.

agency's utility service facility and located within its right-of-way, **not** on the genesis of the dangerous condition. It must also be established that the local agency had sufficient advance notice, or could reasonably be charged with notice under the circumstances, of the dangerous condition, and the foreseeable risks presented by those dangerous conditions to permit it to take timely remedial measures. Here, Met-Ed's evidence established that the City had sufficient advance notice of the dangerous condition of the excavation site as a result of a lack of adequate ground support and the foreseeable risks presented by those dangerous conditions to permit it to take timely action to install shoring or otherwise stabilize the dirt, rocks and soil. The City failed to remediate the dangerous condition, causing the collapse resulting in Met-Ed's injuries.

The Commonwealth Court's decision is hereby reversed.

Justices Baer, Todd, Dougherty and Wecht join the opinion.

Justice Mundy files a concurring opinion in which Justice Baer joins.

Chief Justice Saylor files a dissenting opinion.